**Darion M. CARNEY, Appellant**

v.

**THE AMERICAN UNIVERSITY,**
**Appellee**

No. 97–7080.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 12, 1998.

Decided Aug. 11, 1998.

David H. Shapiro, Washington, DC, argued the cause for appellant. With him on the briefs was Jennifer R. Levin.

Steven R. Semler, Washington, DC, argued the cause and filed the brief for appellee.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

TATEL, Circuit Judge:

Claiming race discrimination and retaliation, appellant challenges the district court's grant of summary judgment to her former employer, The American University. Because we find that appellant raised no genuine issues of material fact regarding either her non-promotion or her dismissal claims, but that she has identified a genuine factual dispute over the alleged retaliation, we affirm in part, reverse in part, and remand.

## I

A senior administrator at The American University since 1981, appellant Darion Carney became Director of Student Services in 1988, the highest ranking African American at the University. A year later, she became Acting Dean of Students, serving in that capacity for two years while the University searched for a permanent Dean. She applied for the permanent position, but the University selected someone else. She then returned to her former position as Director of Student Services. Two years later, the University commenced "downsizing," a process which resulted in the elimination of Carney's position and her dismissal.

Soon after she lost her job, Carney informed the University by letter that she intended to sue. About the same time, a question arose as to whether she might be entitled to an additional three months' severance pay on top of her existing severance package. The University did not give her the extra three months' pay.

Invoking 42 U.S.C. § 1981 and the District of Columbia Human Rights Act, D.C. CODE ANN. §§ 1–2512, 1–2525 (1992 & Supp.1998), Carney filed suit in the United States District Court for the District of Columbia, claiming that the University discriminated against her on the basis of her race when it did not select her for the Dean of Students position, and again when it eliminated her position. She also claimed that the University withheld extra severance pay in retaliation for exercising her civil rights. In defense, the University asserted that it had legitimate, nondiscriminatory reasons for not hiring her and for subsequently eliminating her position. With respect to her retaliation claim, the University argued first that it crafted Carney's severance package before it knew that she intended to sue, and second, that all evidence of linkage between the extra severance pay and her lawsuit is contained in inadmissible settlement correspondence.

The district court granted summary judgment for the University. The court found that Carney failed to rebut the University's legitimate, nondiscriminatory reasons for its decisions not to promote her and to eliminate her position, and that Carney had pointed to no evidence that race played any role in those decisions. The court also rejected Carney's retaliation claims, finding that she failed to establish a causal link between the exercise of her civil rights and the University's failure to make additional severance payments. Our review is *de novo.* *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994).

## II

In order to evaluate claims under 42 U.S.C. § 1981, which prohibits racial dis-

crimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b), courts use the three-step *McDonnell Douglas* framework for establishing racial discrimination under Title VII. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04 & n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Barbour v. Merrill,* 48 F.3d 1270, 1276 (D.C.Cir.1995) (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)). Under that framework, the plaintiff must first establish a prima facie case, *i.e.,* that she is a racial minority, that she applied for an available position for which she was qualified, that she was rejected, and that the employer either filled the position with a non-minority or continued its search. If the plaintiff establishes a prima facie case, the burden shifts to the employer to rebut the inference of discrimination by producing a legitimate, nondiscriminatory reason for the challenged employment decision. The burden then returns to the plaintiff to show that the proffered reason was pretextual. *Id.* Although the burden of persuasion always remains with the plaintiff, to survive summary judgment the plaintiff need only raise a genuine issue of material fact with respect to each element of the *McDonnell Douglas* framework. *See Coward v. ADT Security Systems, Inc.,* 140 F.3d 271, 274 (D.C.Cir.1998). The nonmovant (here Carney), while entitled to all justifiable factual inferences, retains the burden of pointing to "affirmative evidence" establishing a genuine factual dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255–57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Tao,* 27 F.3d at 638 (citing *Alyeska Pipeline Serv. Co. v. U.S. EPA,* 856 F.2d 309, 314 (D.C.Cir.1988)). The same standards govern Carney's D.C. Human Rights Act claims. *See Benefits Communication Corp. v. Klieforth,* 642 A.2d 1299, 1301–02 (D.C.1994).

### The Discrimination Claims

We begin with Carney's claim that the University discriminated against her when it refused to select her for the Dean of Students position. According to the University, Carney had no doctoral degree, her work was unimpressive when she held the position in an acting capacity, and she interviewed poorly.

■ Although Carney has made out a prima facie case—she was a qualified minority candidate and the University eventually filled the job with a white male—she has pointed to no facts suggesting that the University's reasons for her nonselection were pretextual. The job application explicitly stated that a "doctorate" was "preferred." Carney was the only nondoctorate candidate to make it to the semi-finals. Carney admits that she told the selection committee that she had concerns about the requirement that the Dean remain constantly available, an aspect of the job about which the committee felt particularly strongly. She never disputed that complaints were made about her performance as Acting Dean, *e.g.,* she was not always available and not well known on campus. Finally, Carney does not claim that the selection process was tainted or biased; indeed, she handpicked several members of the selection committee, and of the final four candidates (she was not one), two were African American women.

With respect to Carney's second claim—that the University discriminatorily eliminated her position during downsizing—she argues that evidence of the suspect motivations of her supervisor Dean Maurice O'Connell shows that the University's proffered reasons for eliminating the position were pretextual. According to Carney, having placed her in the Acting Dean position, O'Connell then discouraged her from applying for the permanent position, seeming angry when she did apply. She asserts that after she disobeyed him, he grew hostile, lowered her evaluation, and when downsizing occurred, targeted her job for elimination. From these facts, Carney argues that a jury could conclude that O'Connell was motivated by a racist paternalism that turned hostile when she sought the promotion. The University responds that the elimination of Carney's job had nothing to do with her. According to the University,

the downsizing required it to eliminate managers at Carney's level and the nature of her job naturally led to its elimination.

Carney points to three pieces of evidence that she claims establish O'Connell's untruthfulness: his personal hostility after she applied for the Dean's position; a full category decline in his evaluation of her between 1991 and 1993; and evidence indicating that although O'Connell asserted that he had not made the elimination decision alone, the other individuals he identifies as having participated—Residential Housing Director Anne Steen, Dean of Students John Martone, and Acting Provost Ann Ferren—played no role at all. From this evidence, Carney argues that a jury could conclude that O'Connell lied about his reasons for eliminating her job and thus infer discriminatory animus.

■ We think Carney's factual proffer requires too much speculation to create a genuine issue of fact about O'Connell's motivations. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 ("If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted" (citations omitted)). Although Carney says O'Connell lowered her evaluation after she disobeyed him, the record shows he actually gave her a very good evaluation in October–November 1991, immediately after she applied for the Dean's job and was rejected. That two years later he evaluated her less favorably raises no inference of untruthfulness or hidden motivation, especially in the absence of evidence that she deserved a higher grade.

As to Carney's assertion that O'Connell mischaracterized the decision-making process, O'Connell nowhere denies that he played an important role in eliminating Carney's job. Carney's "contradictions" as to the role of other decisionmakers melt away in the face of undisputed facts. Carney makes much of Steen being on maternity leave from March to June, during which time Carney lost her job, but since the meetings discussing the downsizing took place in January and February, nothing in the record contradicts O'Connell's assertion that Steen discussed the matter with him before going on leave. Carney says that Martone's testimony indicates that he did not decide to abolish her job, but according to the record no one ever specifically asked him whether he discussed Carney's role. Carney disputes the University's assertion that Acting Provost Ferren made the decision to abolish her position. But Ferren approved O'Connell's recommendation to eliminate the position and testified that they discussed the downsizing at length.

Finally, even if O'Connell became hostile towards Carney, the evidence she points to raises no inference of O'Connell's mendacity, nor does it undermine his explanation that he eliminated her position because it was managerial. To be sure, irrational hostility could, if unexplained, raise an inference of pretext. But this record provides a reason for O'Connell's asserted hostility: He thought it inappropriate for Carney to have applied for Dean of Students after having chosen search committee members, and then to have listed O'Connell and other committee members as references. Since Carney does not dispute that she did these things, on this record we cannot find that O'Connell's hostility alone calls into question the University's explanation of its decision to eliminate Carney's position.

In sum, Carney has failed to point to any real evidence that O'Connell lied. Mere differences in characterization of evidence, without a single factual contradiction, create no genuine issues for the jury. The district court properly granted summary judgment to the University on Carney's discrimination claims.

*The Retaliation Claims*

■ Like claims of discrimination, claims of retaliation are governed by the *McDonnell Douglas* burden-shifting scheme. *See McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984). Although our sister circuits disagree about whether retaliation violates section 1981, *compare, e.g., Andrews v. Lakeshore Rehabilitation Hosp.,* 140 F.3d 1405, 1412 (11th Cir.1998) (finding cognizable retaliation claim under section 1981), *with Von Zuckerstein v. Argonne Nat. Laboratory,* 984 F.2d 1467, 1472 (7th Cir.1993) (finding no such claim), the University failed to raise this issue on appeal, thus waiving it, *see Oldham v. Korean Air Lines Co.,* 127 F.3d 43, 50 (D.C.Cir.1997). We therefore assume

without deciding that in addition to her retaliation claim under the DCHRA, Carney may proceed under section 1981.

■ To establish a prima facie case of retaliation, Carney must show that (1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection exists between the two. *See Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985); *Howard Univ. v. Green,* 652 A.2d 41, 45 (D.C. 1994) (standard for retaliation claims under DCHRA mirrors standard under Title VII). "The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell,* 759 F.2d at 86. The Fifth and Seventh Circuits have held that withholding benefits to which an employee is otherwise entitled amounts to just the sort of adverse personnel action that can support a retaliation claim. *See EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.,* 821 F.2d 1085, 1089 (5th Cir.1987) ("Clearly if [the employer] stopped providing [the employee] benefits to which he was otherwise entitled simply because he filed a charge, the company would be guilty of retaliation."), *followed by EEOC v. Board of Governors of State Colleges,* 957 F.2d 424, 429 & n. 8 (7th Cir.1992).

Carney contends that the University withheld extra severance pay in retaliation for having signaled her intention to file suit. In a settlement letter from the University's lawyer dated December 12, 1994, responding to a letter from Carney's attorney, the University acknowledged that under certain interpretations of its personnel manuals, Carney might "arguably [be] entitl[ed] . . . to an additional three months' pay." O'Connell testified that he too thought that Carney might be entitled to additional severance pay, but that when he recommended it to Acting Provost Ferren, she refused to consider it because the University had already received Carney's letter expressing her intent to sue. According to the University, the extra severance pay amounted to nothing more than a settlement offer.

Granting summary judgment for the University, the district court found that Carney failed to present evidence of causation, reasoning that the University crafted her initial severance package containing only seven months' severance pay before it knew that Carney intended to sue. The court also held that Rule 408 of the Federal Rules of Evidence prohibited Carney from relying on settlement correspondence to establish causation.

■ We disagree with the district court for two reasons. First, apart from the settlement letters, O'Connell's testimony provides independent evidence from which a jury could conclude that the University retaliated against Carney either by refusing to give her any extra pay or refusing even to consider it. A jury could also infer causation from the fact that about the same time Carney expressed her intent to sue, another senior administrator received additional severance pay. *See Mitchell,* 759 F.2d at 86. Of course, if the University had a legitimate, nonretaliatory reason for withholding Carney's claimed extra pay, it could have done so. We need not decide what would constitute such a reason since this record presents sufficient factual questions regarding the University's good faith—including evidence of Ferren's refusal even to consider Carney's claims to such pay—to preclude summary judgment.

■ Second, although settlement letters are inadmissible to prove liability or amount, they are admissible "when the evidence is offered for another purpose." FED. R. EVID. 408. In particular, such correspondence can be used to establish an independent violation (here, retaliation) unrelated to the underlying claim which was the subject of the correspondence (race discrimination). *See Eisenberg v. University of N.M.,* 936 F.2d 1131, 1134 (10th Cir.1991) (affidavit obtained in settlement negotiations admissible to impose Rule 11 liability); *Urico v. Parnell Oil Co.,* 708 F.2d 852, 854–55 (1st Cir.1983) (evidence of settlement negotiations admissible to show interference with efforts to mitigate damages); *Resolution Trust Corp. v. Blasdell,* 154 F.R.D. 675, 681 (D.Ariz.1993) (evidence of settlement negotiations admissible to prove retaliatory motive); *see also* 23 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE

§ 5314, at 282 (1980) ("Rule 408 is [ ] inapplicable when the claim is based upon some wrong that was committed in the course of settlement discussions; e.g., libel, assault, breach of contract, unfair labor practice, and the like."). Carney offered the settlement correspondence not to prove that the University discriminated against her, but to show that the University committed an entirely separate wrong by conditioning her benefits on a waiver of her rights. The letters were therefore admissible.

■ At the end of its brief, the University urges affirmance on an alternate theory: that Carney's retaliation claims are barred by applicable statutes of limitations. The University maintains that a one-year rather than a three-year statute of limitations governs section 1981 actions. Carney's state law claims, the University argues, are barred by the DCHRA's one-year statute of limitations. Although the University filed no cross-appeal on this issue, we can affirm a district court judgment on any basis supported by the record. See Crocker v. Piedmont Aviation, Inc., 49 F.3d 735, 740–41 (D.C.Cir.1995).

■ The "most appropriate or analogous" state law determines the applicable statute of limitations for section 1981 claims. Goodman v. Lukens Steel Co., 482 U.S. 656, 660, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). The University argues that the District's one-year statute of limitations for certain enumerated intentional torts, D.C.Code Ann. § 12–301(4), not its three-year residual statute of limitations for other personal injury claims, id. § 12–301(8), represents the most "analogous" statute of limitations for purposes of section 1981 actions. The district court rejected this argument, as do we.

■ For statute of limitations purposes, the Supreme Court treats section 1981 claims like claims under 42 U.S.C. § 1983. See Goodman, 482 U.S. at 660–62, 107 S.Ct. 2617 (applying the rule that courts should look to state personal injury statutes to determine the appropriate statute of limitations for section 1983 claims, adopted in Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), to section 1981 claims); see also Banks v. Chesapeake and Potomac Telephone Co., 802 F.2d 1416, 1421–22 (D.C.Cir.1986) (same). The Supreme Court has held that in states with multiple statutes of limitations, claims under section 1983 are governed by the residual or general personal injury statute of limitations (like section 12–301(8)), rather than the statute of limitations for enumerated intentional torts (like section 12–301(4)). See Owens v. Okure, 488 U.S. 235, 243–50, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989). Accordingly, section 12–301(8)'s three-year statute of limitations applies to all section 1981 claims. Because Carney filed suit approximately one year after her discharge, her section 1981 retaliation claim is not barred. Exactly when her claim accrued—and thus whether her DCHRA claim might be barred by the DCHRA's one-year statute of limitations—amounts to a disputed issue of material fact that the district court should resolve at trial.

Although we affirm the district court's grant of summary judgment for the University on Carney's discrimination claims, we reverse with respect to her retaliation claims and remand them for trial.

*So ordered.*