**Dawnele Lyn HOLBROOK, Appellant,**

v.

**Janet RENO, Attorney General, Appellee.**

No. 98–5462.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 7, 1999.

Decided Nov. 26, 1999.

U.S. Attorney, and Mark E. Nagle and R. Craig Lawrence, Assistant U.S. Attorneys.

Before: GINSBURG, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Concluding that appellant, a new agent trainee at the FBI Academy, had not forthrightly answered questions about an alleged improper relationship with her physical trainer, the FBI found her unsuitable to become a Special Agent, reassigned her to her former job as an Intelligence Assistant, and suspended her for five days. Appellant filed suit under Title VII of the Civil Rights Act of 1964, claiming that the FBI discriminated against her on the basis of sex, created a hostile work environment by subjecting her to an intrusive and abusive four-hour interview, and retaliated against her when she filed an EEO complaint. At the close of appellant's case, the district court, finding that she had failed to produce evidence upon which the jury could return a verdict in her favor on any of her claims, granted the Government's motion for judgment as a matter of law. We affirm.

I

After graduating from high school in 1987, Appellant Dawnele Lyn Holbrook went to work for the Federal Bureau of Investigation. She received consistent "exceptional" job ratings and several promotions. Having put herself through college, Holbrook entered the FBI Academy at Quantico in 1995 to begin training to become a Special Agent. Her experience at the Academy forms the basis of this lawsuit. Because the district court granted judgment as a matter of law, we describe the facts in the light most favorable to Holbrook. *See McGehee v. CIA,* 697 F.2d 1095, 1098 n. 3 (D.C.Cir.1983).

Richard L. Swick argued the cause and filed the briefs for appellant.

Anthony M. Alexis, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis,

Holbrook performed well in new agent training. Having developed shin splints during physical exercises, she was referred for treatment to Joe Palermo, an FBI Agent, instructor, and physical trainer. Holbrook and Palermo became friends. They talked about his children and her career goals. At one point, Holbrook went to Palermo's house to pick up empty boxes to move some personal belongings. Seeking a quiet place to study, Holbrook went to his house again the next week. Because bad weather had made the roads dangerous, she accepted Palermo's invitation to spend the night and slept on a downstairs couch. Holbrook spent the night at Palermo's home on three other occasions, each time sleeping on the couch.

At a party celebrating the end of the training program, Special Agent Kevin Crawford, the primary instructor for Holbrook's class at the Academy, observed "eye contact" between Holbrook and Palermo. Suspecting an improper relationship between the two, Crawford reported his observations to Special Agent Lisa Massaroni, the staff counselor responsible for supervising the new agents in Holbrook's class. Massaroni did not report the information to her superiors.

This was not the first time Crawford had taken an interest in Holbrook. He had told Palermo that Holbrook was "fine" and, on another occasion, that Holbrook could some day be "the next Mrs. Palermo." Although Holbrook herself characterized Crawford as a "good instructor," she cited several instances in which he was "unprofessional." For example, he declared his preference for "long-haired blonds" (Holbrook is blond) and made crude sexual allusions during class.

Crawford's suspicions about a Palermo/Holbrook relationship were heightened when, a week after the party, Palermo told Crawford that Holbrook was sick and that the nurse had told him that she should not participate in a training exercise the next day. Questioning the nurse, Crawford learned that although Holbrook had in fact been excused from the exercise, the nurse had never told Palermo about her illness. Crawford reported Palermo's false statement about the nurse, as well as his own suspicions of a relationship, to his superior, Acting Unit Chief Brent Mosher. Mosher had heard about the possible relationship from another instructor. He reported these suspicions to his superior, Assistant Director in Charge of the Academy George Clow, and his deputy, Jeffrey Higginbotham. Concerned that an instructor might be showing favoritism to a trainee, Higginbotham directed Unit Chief Marlene Hunter and Agent Massaroni to interview Holbrook.

During the interview with Massaroni and Hunter, Holbrook denied any romantic relationship with Palermo. Asked if she had been to his home on a date, she answered no. The investigation was closed.

Over the following weekend, Holbrook became concerned about having told the agents that she had not been to Palermo's house for a date. Wanting to clarify that she had been there, but not for a date, she went to see Massaroni. Massaroni had prepared an electronic communication that summarized the interview and stated that Holbrook denied having been to Palermo's home. Holbrook corrected it to read that she had been there "to pick up moving boxes."

When Clow and Higginbotham learned that Holbrook had corrected the electronic communication, they obtained authorization from the FBI's Office of Professional Responsibility ("OPR") to open a formal investigation. Two agents reinterviewed Holbrook. According to Holbrook, the agents questioned her about her "entire sex life" and repeatedly asked her whether she had had sexual relations with Palermo or with other FBI agents. Although Holbrook told them that it was difficult for her to answer their questions because she had been sexually abused as a child, they continued the questioning. Holbrook testified: "It was just very humiliating and

very degrading and embarrassing to have to try to explain a feeling inside or a scare to—to two people that you don't know, and also to people that you know are holding your career in their hands." "[A]t one point," Holbrook testified, "they became very evasive in their questioning, where it didn't matter if I had slept with Mr. Palermo one time or 50 times, that they just basically needed to know how many times I had slept with him." The agent who testified at trial disputed Holbrook's characterization of the meeting, claiming that Holbrook's evasiveness prolonged the session, which lasted four hours.

Based on this interview, Clow concluded that Holbrook had lied about her visits to Palermo's house. He also concluded that she had violated an order not to speak with Palermo during the pendency of the OPR investigation. Finding Holbrook unsuitable to become an FBI Agent, Clow removed her from the Academy and reassigned her to her previous job as an Intelligence Assistant.

OPR subsequently completed its investigation, finding that Holbrook had committed three offenses: exercising poor judgment by maintaining a personal relationship with an instructor; initially lying to her superiors; and disobeying Clow's order not to talk to Palermo. The Unit Chief of OPR's Adjudication Unit, Charles Dixon, approved the OPR staff's recommendation of a three-day suspension. The Academy had recommended only a letter of censure. Noting that Holbrook's misconduct involved "lying and blatant insubordination," Dixon's superiors increased the suspension from three to five days.

During the pendency of the OPR investigation, Holbrook filed an EEO complaint challenging her removal from the Academy. Unable to resolve the complaint, Holbrook filed suit in the United States District Court for the District of Columbia pursuant to Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. §§ 2000e *et seq.* She claimed sex discrimination, sexual harassment, and retaliation for having filed the EEO complaint. After the district court denied the FBI's pre-trial motions, Holbrook tried her case to a jury over three days. She presented thirteen witnesses.

Following the close of her evidence, the district court granted the Government's motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), concluding that Holbrook had failed to produce evidence from which the jury could find in her favor on any of her claims. With regard to her discrimination claim, the district court identified several breaks in the chain of causation between Crawford's allegedly discriminatory remarks and Clow's decision to remove Holbrook from the Academy. The district court also found that Holbrook had not identified any "similarly situated" employees and thus failed to make out a prima facie case of indirect discrimination. Pointing to the absence of any evidence relating to "pervasive conduct" or "intolerable conditions," the district court found that no reasonable juror could conclude that the four-hour interview amounted to sexual harassment. Finally, observing that the evidence on the retaliation claim was "thin to the point of abstraction," the district court concluded that Holbrook had failed to produce any evidence that the five-day suspension was influenced by the filing of the EEO complaint. Holbrook appeals.

II

██ District courts may grant judgment as a matter of law only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the nonmoving party. Fed.R.Civ.P. 50(a)(1). We review grants of judgment as a matter of law *de novo*, affirming only if we find, based on our own independent review of the evidence, that no reasonable jury could reach a verdict in the plaintiff's favor. In making this determination, we view "the evidence in the light most favorable to [the

plaintiff] and resolve all conflicts in [the plaintiff's] favor." *Scott v. District of Columbia,* 101 F.3d 748, 752–53 (D.C.Cir. 1996). Applying this standard, we consider each of Holbrook's claims in turn.

### Sex Discrimination

■ Title VII prohibits the federal government from discriminating on the basis of sex in all personnel decisions. 42 U.S.C. § 2000e–16(a). Holbrook alleges that the FBI discriminated against her on the basis of her sex in violation of Title VII when it found her unsuitable to become a Special Agent and reassigned her to her former non-Agent job as an Intelligence Assistant. Holbrook may prove her case in one of two ways: she may provide direct evidence of her employer's discriminatory intent, or she may invoke the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Holbrook pursues both avenues.

Crawford's behavior forms the basis for Holbrook's direct discrimination claim. Contending that "Crawford created an unprofessional and sexually-charged environment" by indicating his preference for long-haired blonds, making various sexual comments, and telling another instructor that Holbrook was "fine," Holbrook argues that "but for Mr. Crawford's gender-based interest in [her] personal life, she would now be serving as an FBI agent." She argues that because Crawford was the "driving force" in the process that led to her termination, his improper comments amount to evidence of direct discrimination.

Holbrook's direct discrimination case suffers from two fatal flaws. First, not only did she introduce no evidence from which the jury could have concluded that Crawford harbored any discriminatory in-

tent, but her counsel described Crawford's behavior as merely "sort of immature." Holbrook herself testified only that Crawford was "a little unprofessional."

Second, even if the jury could have concluded from Crawford's "immature" behavior that he intended to discriminate against Holbrook, Crawford's behavior cannot form the basis of a direct discrimination claim because the record contains no evidence that he participated in the Bureau's decision that Holbrook was unsuitable to become an FBI Agent. As the district court pointed out, there are at least two breaks in the chain of causation between Crawford's actions and Holbrook's removal from the Academy. Contrary to Holbrook's contention that Crawford was the "driving force" behind the investigation into an improper relationship between her and Palermo, Mosher, the Acting Unit Chief, testified that another instructor had reported similar concerns. Even more important, it was not the investigation of Palermo—the investigation that Crawford may have initiated—that ultimately led to Holbrook's removal from the Academy. Both Clow and Higginbotham testified that they considered the Palermo matter closed after Holbrook denied going to his house. Only after Massaroni reported that Holbrook may have lied did they reopen the investigation.

This case is controlled by *Hall v. Giant Food,* 175 F.3d 1074 (D.C.Cir.1999). *Hall* held that a supervisor's discriminatory remarks could not be considered evidence of discrimination because the decision to dismiss the employee was made not by the supervisor, but by the company's Director of Transportation. *See id.* at 1079–80. Although the supervisor had reported the employee's misconduct to the Director, the Director "made an independent assessment of Hall's conduct." *Id.* at 1080. The same happened here. Clow "made an independent assessment" of Holbrook's conduct and determined that she was unsuitable to become an FBI Agent. Nothing in the record indicates either that Crawford

had input into Clow's decision or that Crawford discussed Holbrook's suitability with Clow or Higginbotham. Holbrook's counsel never questioned Crawford on this critical point.

■ Holbrook's indirect discrimination claim fares no better. To establish a prima facie case under the *McDonnell Douglas* framework, Holbrook must demonstrate (1) that she is a member of a protected class; (2) that she was similarly situated to an employee who was not a member of the protected class; and (3) that she and the similarly situated person were treated disparately. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Ramsey v. American Air Filter Co., Inc.*, 772 F.2d 1303, 1307 (7th Cir.1985). Although the *McDonnell Douglas* framework "drops from the case" once the defendant responds to the plaintiff's proof and offers rebuttal evidence, it remains relevant here because the district court granted judgment as a matter of law before the Government presented its case. *United States Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

■ To prove that she is similarly situated to a male employee, a female plaintiff must demonstrate that she and the allegedly similarly situated male employee were charged with offenses of "comparable seriousness." *See Lynn v. Deaconess Med. Center–West*, 160 F.3d 484, 488 (8th Cir. 1998) (internal quotation marks omitted). A plaintiff must also demonstrate that "all of the relevant aspects of her employment situation were 'nearly identical' to those of the male" employee. *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C.Cir.1995) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir.1994)). *Neuren* concluded that a female associate at a law firm who was terminated because of her failure to get along with others was not similarly situated to a less senior male associate who had trouble with legal writing. 43 F.3d at 1514. *Barbour v. Browner*, 181 F.3d 1342 (D.C.Cir.1999), concluded that two EPA employees with similar job descriptions, one a GS–12 and the other a GS–13, were not similarly situated. In making this determination, *Barbour* relied on the fact that the GS–13 performed several duties that the GS–12 (the plaintiff) did not. *Id.* at 1345.

With this standard in mind, we turn to Holbrook's evidence. She claims to be similarly situated to three employees: two new agent trainees allowed to become FBI Agents despite their misconduct and Palermo himself. The district court concluded that none was similarly situated to Holbrook, and we agree.

Holbrook's counsel elicited from Clow only sketchy details about the first of the agent trainees. Calling the trainee a "class clown," Clow expressed concerns about his suitability to become an FBI Agent, explaining that the trainee "said inappropriate things at inappropriate times" and "was an instigator of class misbehavior." Despite this immature behavior, the trainee was permitted to graduate. From what little we know about the trainee, we share the district court's view that his situation was not "nearly identical" to Holbrook's. Holbrook's offenses—lack of forthrightness and disobedience—and immature behavior are hardly of "comparable seriousness."

The second trainee admitted to drinking before driving. Although the FBI reprimanded the agent for poor judgment, it allowed him to graduate. As the district court concluded, this trainee is not similarly situated to Holbrook because, like the first trainee, he was accused of "misconduct of a type that does not involve honesty and forthrightness, which is what Ms. Holbrook's case was about."

Palermo's offense, unlike the offenses of the two agent trainees, is comparable to Holbrook's. Holbrook was disciplined for lying and disobedience; Palermo was disciplined for lying and engaging in an improper relationship with a subordinate. At

this point, however, the similarity between Palermo and Holbrook ends. Palermo was a fifteen-year FBI veteran with supervisory responsibilities. Holbrook was a probationary trainee. *Neuren's* conclusion that the two law firm associates were not similarly situated rested in part on the difference in their seniorities. Because "the partners weren't as pressed to make a decision regarding [the less·senior male employee's] partnership prospects as they were with [the plaintiff's]," the plaintiff could not create an inference of discrimination by reference to the fact that she was fired but he was not. 43 F.3d at 1514. If the difference in seniority between the *Neuren* plaintiff and another associate undermined her claim that they were similarly situated, we cannot see how Holbrook, a probationary trainee, could possibly be similarly situated to a fifteen-year veteran with supervisory responsibilities. Indeed, in *McKenna v. Weinberger*, 729 F.2d 783 (D.C.Cir.1984), we expressly held that a probationary employee was not similarly situated to a permanent employee, noting that "agency regulations mandated that probationary employees with serious performance problems were to be terminated, even if those problems would not have been good cause for terminating a permanent employee." *Id.* at 789–90.

Holbrook and Palermo are not similarly situated for another, related reason. As the FBI points out, their different seniorities made it impossible for the FBI to discipline them similarly. Because Palermo had been an Agent for fifteen years, finding him unsuitable to *become* an Agent (Holbrook's sanction) was simply not an option. Because Holbrook was a probationary trainee, reassigning her to a different *Agent* position (Palermo's sanction) was likewise not an option. And with respect to the sanction that the FBI could impose on both—suspension—Palermo's was more severe (his two weeks versus her five days).

*Sexual Harassment*

 Two types of sexual harassment are actionable under Title VII: quid pro quo and hostile work environment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65–66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). This case involves the latter. Holbrook argues that the intrusive nature of the questioning during the four-hour interview with the two agents, together with the abusive manner in which she says it was conducted, created a hostile work environment. To violate Title VII, workplace harassment must be "sufficiently severe or pervasive to 'alter the conditions of [the victim's] employment'" and "'unreasonably interfer[e] with an individual's work performance.'" *Id.* at 67, 65, 106 S.Ct. 2399 (internal citations omitted).

With respect to the evaluation of the sufficiency of the harassment evidence, it is important to keep in mind that Holbrook does not claim that Crawford's "unprofessional" and "immature" behavior contributed to the allegedly hostile work environment. She focuses only on the four-hour interview, testifying that she was questioned about "basically every sexual relationship" in which she had ever been involved.

Fully crediting Holbrook's version of the interview, the jury could have concluded that it covered intrusive subjects of an extremely personal nature not at all relevant to the investigation. The jury could also have found that these questions were asked in an abusive and degrading manner. What the jury could not have concluded—because neither Holbrook's testimony nor any other evidence at trial addressed the issue—was that the interview either "'alter[ed] the conditions'" of Holbrook's employment or "'unreasonably interfer[ed] with [her] work performance,'" as *Meritor* requires. 477 U.S. at 67, 65, 106 S.Ct. 2399 (internal citations omitted). Did the nature of the questioning change the nature of Holbrook's job? Did the questioning change how Holbrook felt about her job? Did it interfere with

her job performance or make it more difficult for her to do her job? Did it change how people treated her? The jury would have had no way of knowing answers to questions that Holbrook's attorney never asked.

All the record reveals about Holbrook's post-interview work environment is that she returned to her non-Agent job, where she continued to perform exceptionally well. To be sure, Holbrook did testify that it was "difficult" to return to her former job "with everybody knowing that [she] didn't accomplish what [she] set out to do." What other people thought about whether she had accomplished her goals, however, has nothing to do with the effects of the interview, the basis of her sexual harassment claim. We thus agree with the district court that no reasonable jury could have found that the interview created a hostile work environment.

### Retaliation

■ We turn finally to Holbrook's claim that the FBI retaliated against her for filing the EEO complaint. Because she did not file the complaint until after the FBI determined that she was unsuitable to become a Special Agent, her retaliation claim focuses only on the five-day suspension. And because the OPR investigation began before she filed her EEO complaint, her retaliation cause of action boils down to her claim that "her punishment was progressively increased" from a letter of censure to a five-day suspension.

■ Claims of retaliation are governed by the *McDonnell Douglas* burden-shifting framework. *See Carney v. The American University*, 151 F.3d 1090, 1094 (D.C.Cir. 1998). To establish a prima facie case, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection between the two exists. *Id.* at 1095. If a prima facie case is established, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory

reason for the adverse action. The employee must then prove by a preponderance of the evidence that the asserted reason is a pretext for retaliation. *See McKenna*, 729 F.2d at 790.

Holbrook has easily satisfied the first two elements of a prima facie case. She engaged in statutorily protected activity by filing an EEO complaint. She was subject to adverse personnel action when she was suspended for five days.

■ To satisfy the third element of a prima facie case—a causal connection between the statutorily protected activity and the adverse personnel action—Holbrook must show that the FBI "had knowledge of [her] protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985). Charles Dixon, the head of the OPR Adjudication Unit who recommended the three-day suspension, testified that he knew about Holbrook's EEO complaint. But the record does not establish that Dixon's superiors knew about the complaint when they increased the suspension from three to five days. Holbrook's counsel never called them to testify.

We need not decide whether Dixon's knowledge alone could be sufficient to make out a prima facie case, for even if Holbrook had established a prima facie case, the FBI has satisfied its burden of articulating a legitimate, nondiscriminatory reason for Holbrook's five-day suspension, and Holbrook has offered no evidence of pretext. As to the FBI's burden, Dixon explained that Holbrook's conduct—lying, disobedience, and poor judgment—merited a sanction more serious than a letter of censure. He also characterized the three-day suspension that he recommended as "relatively minor." While the record contains no direct testimony explaining why Dixon's superiors increased the suspension to five days, one of the superiors wrote in a note that "lying and blatant insubordination[ ] [d]eserve more than three [days]

unless there is strong precedent in opposition." The OPR report reviews Holbrook's misconduct in detail, canvasses prior cases involving discipline of new agent trainees, and concludes that a five-day suspension is appropriate. Holbrook, moreover, points to no evidence from which the jury could have inferred that these plainly nondiscriminatory explanations were a pretext for punishing her for filing the EEO complaint. As the district court found, "There was absolutely no credible suggestion on this record that anybody was influenced or that [the decision to suspend Holbrook for five days] was affected in any way by the pendency of the plaintiff's EEO complaint." The only relevant evidence is to the contrary: asked by Government counsel if he had been influenced by the filing of the EEO complaint, Dixon said no.

Because Holbrook offered no evidence on which the jury could have found in her favor on any of her claims, we affirm.

*So ordered.*