Karen A. COLES, Plaintiff,

v.

Stephen PERRY, Administrator, General Services Administration, Defendant.

Civil Action No. 01–732(JMF).

United States District Court, District of Columbia.

June 25, 2003.

Robert Charles Seldon, Seldon Anderson, P.C., Washington, DC, for plaintiff.

Meredith Manning, Hogan & Hartson, L.L.P., Daria Jean Zane, David Jackson Ball, Jr., Jane M. Lyons, Washington, DC, for defendant.

## MEMORANDUM OPINION

FACCIOLA, United States Magistrate Judge.

I herein resolve defendant's *Motion to Dismiss and for Summary Judgment.*

For the reasons set forth below, defendant's motion for summary judgment will be denied in part and granted in part.

## STATEMENT OF FACTS NOT IN DISPUTE

1. On July 29, 1991, Karen A. Coles ("plaintiff"), began working as a Criminal Investigator GS–1811–13 or Grade 13 Special Agent, in the Office of Inspector General ("OIG") of the General Services Administration ("GSA" or "defendant"). Plaintiff was assigned to defendant's headquarters in Washington, D.C. and reported directly to Deputy Assistant Inspectors General for Investigations Albert Puglia and Gregory Seybold, and Assistant Inspector General for Investigations James Henderson.

2. On November 11, 1996, plaintiff suffered an injury while at work. Plaintiff was approved to receive Federal Employee's Workers Compensation benefits from January 5, 1998, to July 25, 1998. Plaintiff was also approved for sick leave from December 4, 1996, to January 6, 1997. Upon her return from sick leave, plaintiff was slated for reassignment to one of defendant's nine regional field offices. Plaintiff was also limited to light duty pending her surgery on April 23, 1997.

3. On January 14, 1997, upon learning of her pending reassignment to defendant's Washington, D.C. Field Office, plaintiff sought informal counseling from the Equal Employment Opportunity Commission ("EEOC"). She alleged that Deputy Inspector General Joel Gallay, Assistant Inspector General for Inspections James Henderson ("Henderson"), and Deputy Assistant Inspector General for Investigations Gregory Seybold had discriminated against plaintiff on account of her race,

sex, and temporary disability by reassigning her to the Washington Field Office under the immediate supervision of Regional Inspector General Thurman Dutton ("Dutton"), an African American, in order to facilitate her removal. On March 24, 1997, plaintiff's Equal Employment Opportunity ("EEO") counselor issued a report, but plaintiff did not pursue the issue further.

4. On August 18, 1997, Dutton gave plaintiff a summary performance rating of "3" for the 1996–1997 cycle. On September 2, 1997, plaintiff filed an internal grievance report with defendant, challenging her appraisal. Following the filing of plaintiff's grievance, plaintiff was detailed to the General Accounting Office ("GAO") from November 24, 1997, to June 12, 1998. During her detail at GAO, plaintiff's performance was rated as "Outstanding."

5. On January 5, 1998, while plaintiff was still detailed at GAO, Dr. Anthony Caputy, plaintiff's orthopedic surgeon, determined that she was able to return to full duty without qualification. On May 15, 1998, plaintiff was asked to take a fitness for duty examination, which was scheduled for May 20, 1998, with Dr. Samuel Scott. On May 20, 1998, Dr. Scott issued his report. Plaintiff was cleared, without qualification, for return to duty as a Special Agent.

6. On June 12, 1998, Dr. John Starr, another orthopedic surgeon who operated on plaintiff, issued a report recommending that plaintiff be allowed to postpone her participation in a Defensive Tactics Training ("DTT") session that was scheduled for June 17–18, 1998. Plaintiff did not participate in the DTT session and was ultimately placed on administrative leave.

7. On June 30, 1998, in response to defendant's request for additional information regarding plaintiff's physical condition, Dr. Scott indicated that plaintiff was cleared to resume assumption of the duties of her position as a Special Agent as long as she refrained from participating in training exercises that involved kicks to the back, torso, or legs.

8. On September 17, 1998, plaintiff formally requested a transfer from Dutton's regional office back to defendant's headquarters. Four days later, plaintiff's request was denied.

9. On September 22, 1998, in response to another request from defendant for additional information about plaintiff's physical condition, Dr. Starr indicated that plaintiff was fully capable of resuming her duties as a Special Agent.

10. On or about October 2, 1998, defendant asked Dr. Bruce Butler to evaluate plaintiff's physical condition.

11. On October 16, 1998, plaintiff again formally requested a transfer to headquarters. That request was subsequently denied.

12. On October 28, 1998, Dr. Butler issued a report on plaintiff's condition, concluding that she was incapable of returning to full duty as a GS–1811 Special Agent.

13. On November 30, 1998, plaintiff filed a formal EEO complaint.

14. On January 22, 1999, defendant proposed reassigning plaintiff to another position.

15. On February 24, 1999, Dutton told plaintiff about an opening for a Grade 14 Special Agent position. Plaintiff applied for the position.

16. On March 3, 1999, plaintiff was reassigned to a GS–12 Management Analyst position in defendant's Washing-

ton, D.C. Field Office, effective March 29, 1999.

17. On March 15, 1999, the U.S. Department of Labor, Office of Workers Compensation Programs, Division of Federal Employees' Compensation concluded that plaintiff was not disabled and had not been disabled since July 25, 1998.

18. On March 16, 1999, plaintiff was placed on the Best Qualified list for a Grade 14 Special Agent position. On March 18, 1999, plaintiff was removed from the Best Qualified list. On or about April 7, 1999, defendant selected Michael Deshields for the Grade 14 Special Agent position.

## LEGAL STANDARDS

### I. *Summary Judgment Standard*

To prevail on its motion for summary judgment, the defendant must establish that on the basis of the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits," no reasonable finder of fact could render a verdict in the plaintiff's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Since this a Title VII case, the familiar burden shifting introduced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is applicable.

Under the *McDonnell* analysis, plaintiff, a member of two protected groups as an African American and as a woman, must first make out a *prima facie* case by showing that she not only suffered an adverse employment action, but that persons not members of those protected groups did not suffer as she did. *Holbrook v. Reno,* 196 F.3d 255, 260 (D.C.Cir.1999). If she meets that burden, it then shifts to defendant who must show a legitimate business rea-

son for the actions claimed to be discriminatory. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. 1817. Once the defendant brings forth those reasons, plaintiff must show that the proffered reasons are a mere pretext for discrimination. *Id.* If the jury believes the reasons are pretextual, it may then infer that the real reason was the discrimination or retaliation that the defendant denies. *Reeves v. Sanderson Plumbing,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *See also Aka v. Washington Hospital Center,* 156 F.3d 1284, 1292 (D.C.Cir. 1998).

While the same burden shifting analysis applies to her retaliation claim,[1] the *prima facie* case plaintiff must establish is, of course, different. She must show that she engaged in statutorily protected activity, her employer took adverse employment action, and a causal connection between the two exists. *Holbrook,* 196 F.3d at 263.

Before turning to whether plaintiff has met these burdens, we must clear away some brush. As originally drafted, plaintiff's complaint charged that three of defendant's actions against her were the product of racial and sexual discrimination: (1) defendant's decision to preclude plaintiff from participating in the Defense Tactics Training ("DTT") scheduled for June 17–18, 1998, and its subsequent decision to place plaintiff on administrative leave, (2) defendant's decision to remove plaintiff from the Best Qualified list for a vacant Grade 14 position, and (3) defendant's decision to disqualify plaintiff from continuing to work as a series 1811 Criminal Investigator, demoting her from a Grade 13 Special Agent position at OIG headquarters to a Grade 12 Management Analyst position at OIG's Washington Field Office, and not reinstating her as a Special Agent.

---

1. *Holbrook,* 196 F.3d at 263.

To be actionable, each of these employment decisions must constitute an adverse employment action. As I have stated in an earlier opinion:

It is certainly true that, lest they micromanage businesses and federal agencies and be overwhelmed by every trivial complaint, the courts have insisted that the personnel action complained of in a Title VII action be substantial. In this Circuit, that means that plaintiff must allege that she endured "objectively tangible harm." *Brown v. Brody,* 339 U.S.App. D.C. 233, 199 F.3d 446, 457 (D.C.Cir.1999). There must be some showing of "materially adverse consequences affecting the terms, conditions or privileges of her employment or her future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm." *Id.*

*Higbee v. Billington,* 246 F.Supp.2d. 10, 13–14 (D.D.C.2003).

Plaintiff has now abandoned any claim that her being precluded from attending Defense Tactics Training constitutes an adverse employment action. *Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss and for Summary Judgment* at 27 n. 6.

■ As to her remaining claims, defendant's decision to remove plaintiff from the Best Qualified list for the vacant Grade 14 position, thus destroying her ability to advance from the GS–12 to which she had been reassigned, constitutes a refusal to even consider her for promotion and easily qualifies as an adverse employment action. *See Burlington Indus. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)(tangible employment action is one that "constitutes a significant change in employment status, such as a hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a de-

cision causing a significant change in benefits.").

■ Finally, precluding plaintiff from working as a GS–13 Special Agent and reassigning her as a GS–12 Management Analyst clearly constitutes a significant change in plaintiff's employment status. As defendant concedes, "although Plaintiff was awarded supplemental pay to compensate for the loss of her law enforcement availability pay ('LEAP'), because she no longer participated in the law enforcement retirement, her pay and benefits were affected." *Defendant's Motion for Summary Judgment* at 26, n. 7. For the same reason, defendant's refusal to reinstate plaintiff as a GS–13 Special Agent, forcing her to remain as a GS–12 Management Analyst, clearly affects the terms, conditions, or privileges of her employment, and is, therefore, also an adverse action. *See Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999).

## II. *Plaintiff's Claims of Retaliation*

### A. *Plaintiff has Established a Prima Facie Case*

■ Defendant does not dispute that plaintiff engaged in protected activity, but claims that plaintiff cannot make out her *prima facie* case that her reassignment was retaliatory because she cannot "establish a causal connection between her reassignment [from a GS–13 Special Agent to a GS–12 Management Analyst], based upon Dr. Butler's medical review, and her use of the prior EEOC process." *Defendant's Reply to Opposition to Motion for Summary Judgment* at 7–8.

Defendant has to admit, however, that, after Dr. Scott cleared plaintiff to return to duty, it was Dutton who, in letters to Drs. Scott and Starr, described at length the physical demands upon Special Agents because of their duties. *Memorandum of*

*Points and Authorities in Opposition to Defendant's Motion to Dismiss and for Summary Judgment,* Pls. Exh. 32 and 36. In his deposition, Dutton explained how he briefed Dr. Butler orally and then wrote him a letter as to those demands. *Dutton Deposition* at 106–112.

Plaintiff's central contention is that Dutton's explanation of the duties of a Special Agent is a willful exaggeration of the actual physical demands imposed upon agents and was designed by Dutton to get rid of her. Plaintiff intends to present testimony to that effect and to show that Dr. Butler's ultimate report finding her unfit for duty was based upon a misapprehension of her actual duties. If plaintiff can establish all of that, she will have established a causal connection between what Dutton said and what Dr. Butler concluded, meeting her burden of eliciting sufficient evidence of a causal connection between what Dr. Butler did and the actions of Dutton, the person she accuses of retaliation.

■ Since plaintiff made out her *prima facie* case, the burden shifts to the defendant to justify its action. It surely has done so, marshaling evidence in support of its contention that the medical evidence produced by the various doctors was ambiguous, and, therefore, it justified requesting additional information from the doctors and the final evaluation by Dr. Butler that lead to her reassignment.

Plaintiff, looking at the same evidence, insists that the medical evidence was unequivocal that plaintiff was fit for duty and that defendant disregarded the opinion of several, reputable physicians and "shopped" until it found one who would support its removal of plaintiff from the Special Agent position. As just explained, plaintiff will insist that Dutton (and others) exaggerated the physical demands of the job and, therefore, used an utterly unrealistic standard to judge her fitness for duty so that she was subject to a standard that applied only to her. Plaintiff also contemplates a ferocious attack on the integrity and validity of Dr. Butler's report.

As is self-evident, this evidence permits either of these two conclusions and thereby creates a genuine issue of fact. If, as defendant contends, the medical evaluations of the defendant were ambiguous, justifying Dr. Butler's retention, then, by dictionary definition, they were susceptible of more than one interpretation and their interpretation creates an issue that only the finder of fact can resolve. Furthermore, the credibility and independence of Dr. Butler's evaluation and the truthfulness of Dutton's representations to him of the physical demands of the job directly challenged by contrary, expert proof[2] cannot possibly be resolved by summary judgment. *Athridge v. Iglesias,* 167 F.Supp.2d 389, 392 (D.D.C.2001).

Finally, the teaching of the opinion in *Aka,* followed by the Supreme Court in *Reeves,* is that disbelief of the reasons provided by the defendant for its actions may suffice to permit the inference that the real reasons were retaliatory or discriminatory. Whether the defendant's reasons are credible explanations for its action unquestionably are functions of the credibility of the witnesses who present them. For me to assess their credibility would be improper.

## B. *Racial Discrimination Claim*

■ Plaintiff does not point to any direct indications of racial animus. She must therefore make her case circumstantially by showing that she was treated dissimilarly from persons not members of

---

2. Plaintiff will call a physician, Dr. Raford, to attack Dr. Butler's report. *See Memorandum of Points and Authorities in Opposition to De-* *fendant's Motion to Dismiss and for Summary Judgment* at 20–22.

a protected group. Therefore, plaintiff must point to specific employment actions in which she was treated differently and she must identify with specificity those individuals who were treated more favorably. *See Higbee v. Billington,* 246 F.Supp.2d 10, 15 (D.D.C.2003).

■ Moreover, in this Circuit, the showing of similarity is demanding. She must show a near identity of circumstances between her situation and that of the person to whom she compares herself. *Holbrook,* 196 F.3d at 261 (*quoting Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C.Cir.1995)). *Accord Barbour v. Browner,* 181 F.3d 1342 (D.C.Cir. 1999).

Plaintiff's fundamental claim is that she suffered adverse employment actions when she was precluded from working as a Special Agent, reassigned to a field office, and precluded from reinstatement as a Special Agent. She does not identify any one who was treated similarly, and the other agent who was examined by Dr. Butler and found to be unfit had a psychological impairment. *Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss and for Summary Judgment* at 40.

■ She tries another tack. As will be recalled, plaintiff was supposed to go to Defensive Tactics Training on June 17–18, 1998. On June 12, 1998, she produced a note from Dr. John Starr who recommended that she be allowed to postpone her participation in the training. This training was created and conducted by Lori Courtney ("Courtney"). In her deposition, Courtney indicated that, when plaintiff presented her a note from plaintiff's doctor indicating that she should not participate, she referred the question of plaintiff's participation to Dutton. *Courtney Deposition* at 44. Ultimately, Dutton

placed plaintiff on administrative leave and she never attended the training.

Plaintiff points to two groups of white males to whom she would compare herself. First, as Courtney explained, one portion of the training, the Redman Drill in which participants actually grapple with each other, is physically demanding. Agents, who feared that participation would hurt them because of prior injury or physical condition, were permitted to sit out the Redman Drill. *Courtney Deposition* at 24–27. Indeed, plaintiff produced a declaration from an agent in Fort Worth who explained how he excused himself from participation in the Redman Drill because of a back injury with Courtney's approbation. *Declaration of Larry McLain.* McLain also named other agents who, like them, were permitted by Courtney not to participate. *Id.*

Plaintiff's comparison between herself and these agents fails the test of nearly identical situations. She sought to be excused from the entire training, not just a portion of it. Second, Courtney approved these agents' not participating in a portion of the training, but she referred plaintiff's doctor's note to Dutton who made the decision in plaintiff's case. Dutton had nothing to do with what Courtney did or did not do in training sessions held across the United States. Indeed, McLain was referring to training sessions held in Fort Worth, Texas.

Plaintiff's second comparison deals with the two agents who were permitted to remain as agents despite significant physical impairments. In one case, James Henderson waived the vision requirements for a Philadelphia agent. In the second case, according to plaintiff,[3] GSA supervisors in Texas permitted an agent to return to duty although he had serious surgery in

---

**3.** Exhibit 11, as to this agent is incomplete.

which a donor vertebra was implanted in his spine. *Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss and for Summary Judgment* at 33.

Again, these two situations flunk the test of being nearly identical to plaintiff's situation for similar reasons as mentioned above. First, Dutton had nothing to do with either decision. Neither of the two comparable agents were found fit for duty under circumstances equivalent to plaintiff's being found unfit after a medical evaluation devoted to that question. All one can say is that other supervisors in other places were more forgiving about physical impairments than Dutton, but that hardly permits the inference that the difference was predicated on the race of the agents when the alleged discriminatory official, Dutton, had nothing to do with the other cases. It is impossible for a rational fact finder to deduce the intent with which Dutton acted by comparing his behavior with the behavior of other persons confronted with similar situations.

The situation as to the agent who was blind in one eye is different because it appears that James Henderson waived the vision requirement and plaintiff accuses Henderson of conspiring with Dutton to demand Dr. Butler's independent evaluation. But, with that said, the two situations are still so radically different that the inference that he was racially motivated cannot be drawn consistently with the exacting demands of the *Holbrook* standard.[4]

### III. *Hostile Environment Claim*

█ Both plaintiff and Dutton are African American. To press a hostile environment claim, plaintiff asserts that Dutton displayed hostility toward her from the moment she arrived at the Washington

Field Office until she was reassigned. But, as plaintiff has to admit, she does not cite a single instance where Dutton (or anyone else) refers to her race or to her gender. That deficiency dooms her claim. *Rowland v. Walker*, 245 F.Supp.2d. 136, 142 (D.D.C.2003).

I note in this context that it was necessary for the Supreme Court to create the claim of a hostile environment because, for example, a woman victimized by daily suggestive comments who kept working could not meet the requirement of showing discrimination in the terms and conditions of her employment if she continued to work at the same pay in the same job. To rescue her from that situation, the Supreme Court held that pervasive racial or sexual references could so alter the working environment that the victim could be said to have suffered a change in the fundamental terms and conditions of her employment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). But, no court has ever extended that principle to a claim based on retaliatory behavior and created an action for, as it were, a "retaliatory hostile environment." Until the Supreme Court does, this plaintiff does not have an actionable claim of hostile environment based on behavior in which there was no reference whatsoever to her race or sex.

An order accompanies this Memorandum Opinion.

### ORDER

Upon consideration of defendant's motion, plaintiff's opposition thereto, and defendant's reply thereto, and in accordance with the accompanying Memorandum Opinion, it is, thereby,

---

4. Plaintiff's sexual discrimination claim also fails for the same reasons the racial discrimi-

nation claim fails.

ORDERED that *Defendant's Motion for Summary Judgment* [# 52] is **DE-NIED** in part and **GRANTED** in part.

**SO ORDERED.**