Raneene WILLIAMS, Plaintiff,

v.

VERIZON WASHINGTON, DC, INC., Defendant.

No. CIV.A.01–2391 RMC.

United States District Court, District of Columbia.

June 5, 2003.

John W. Hermina, Hermina Law Group, Laurel, MD, for Plaintiff.

Harry Thomas Jones, Jr., HOGAN & HARTSON, Washington, DC, for Defendant.

## MEMORANDUM OPINION

COLLYER, District Judge.

Raneene Williams sues Verizon Washington, D.C., Inc. ("Verizon"), alleging that she has suffered discrimination from a sexually hostile workplace and a retaliatory discharge after she complained. Following full discovery, Verizon has now filed for summary judgment, which Ms. Williams opposes.

Having carefully considered the briefs, depositions, discovery materials and other pleadings of record, the Court concludes that Verizon's motion should be granted.

### Background Facts

Ms. Williams worked as a Maintenance Administrator for Verizon in the Potomac Business Customer Repair Service Center in Washington, D.C. Her job entailed taking telephone-line repair calls from business customers and entering that information into a computer database. Tawanda Stewart was Ms. Williams's direct supervisor and Percy Covington was another first-line supervisor in the Service Center. Toni Newkirk was the Manager of the Service Center.

Ms. Williams was hired on January 3, 2000, and terminated on October 18, 2000. There is no material issue about the quality of her performance on the job. Verizon asserts that Ms. Williams was terminated for failing to meet the attendance and punctuality requirements of the job.[1] Ms. Williams has admitted that she accrued at least twenty (20) absences and ten (10) tardy arrivals/early departures that advanced her through Verizon's four-step Regional Attendance Plan ("Attendance Plan") and that all but one of these absences and tardy incidents were "chargeable" under the Plan. See Plaintiff's Admissions at 3, 11, 16, 31, 50, 52, 55, 63, 69, 72, 75, 78, 81, 84, 87, and 90.[2] Under the Attendance Plan, a manager considers whether termination is the appropriate discipline once an employee reaches the fourth step. See Motion for Summary Judgment, Ex. 8, Regional Attendance Plan.

Ms. Williams asserts that her tenure with Verizon was marred by *quid pro quo* sexual harassment and a hostile work environment in violation of Title VII's pro-

---

1. Ms. Williams admits that she made a personal call from her work station, contrary to Verizon work rules, and had ice cream at her desk on one occasion. Eating ice cream at her desk would also violate a Verizon work rule. Plaintiff's Admissions at 99, 101, 102, 103, 104.

2. Ms. Williams contends that she was present and dismissed early on July 12, 2000 and given excused unpaid leave on July 13, 2000. Plaintiff's Admissions at ## 40, 41. These particular absences would not have affected operation of the Attendance Plan because of other, contemporaneous, absences. Ms. Williams also denies that she was told on September 28, 2000, that she was placed on Step 3 of the Plan. Plaintiff's Admissions at 67, 68. Because Ms. Williams acknowledges that she received training on the Attendance Plan on or about February 8, 2000, and was given another copy of the Plan on July 5, 2000, see Plaintiff's Admissions at 1, 2 & 30, the Court does not find the issue of notice to Ms. Williams that she had advanced to the third step of the Plan to be a material issue of genuine dispute. Indeed, Ms. Williams does not argue that it is.

scription against sex discrimination. *See* 42 U.S.C. § 2000e *et seq.* In response to interrogatories, she described the relevant incidents:

> On June 26, 2000, Percy Covington approached my desk and poked me in the side. My back was to Mr. Covington. I jumped and turned towards him indicating that I was startled [and] he said, "I know, I can tell by the way the hairs on your neck stood up." On more than one occasion Mr. Covington has said to me, "oh you can get it" and when I asked, "get what?" his reply was, "oh you know what I am talking about." On September 8, 2000, during a conversation with Mr. Covington he said to me, "I know you want me." He admitted to me that he wanted me "from the time [I] came to the floor." He then asked me, "don't you want me?" Later that day at his cubicle Mr. Covington asked me if I could get a hotel room for him [at the Embassy Suites where I work] and I said, "sure, just let me know when," and he said, "whenever you're available." I told him I would get him a room, but I would not join him. He then said, "you should go to your desk because if you stay here any longer people may think we were doing something back here." While passing my desk throughout the night Mr. Covington continued to state to me, "I know you want me."

Interr. Answ. at # 1. The remarks "oh you can get it" made by Mr. Covington prior to September 8, 2000, were perceived as jokes by Ms. Williams at the time. Williams Dep. at 146–47. These comments

had no effect on her personal work environment. *Id.* at 151–52.[3]

The incidents on September 8, 2000, had a more upsetting and direct effect. As summarized above, Mr. Covington talked with Ms. Williams at her work station about her dissatisfaction with her job and her desires to do something else. At the end of this conversation, Mr. Covington allegedly said, "let me ask you something ... you want me, don't you?" Williams Dep. at 142. Ms. Williams "didn't say yes, [ ] didn't say no." *Id.* at 143. Later that day, when talking with Mr. Covington at his work station, the subject of Ms. Williams's second job at the Embassy Suites hotel came up. Mr. Covington allegedly asked, "Can you get me a room?" *Id.* at 332. When Ms. Williams asked, "When?" he alleged replied, "Whenever you're available." *Id.* Ms. Williams says she declined and left his work station. *Id.* Mr. Covington thereafter repeated the "You know you want me" comments two or three times during the evening shift on September 8, 2000. He made no overtures to Ms. Williams after September 8th.

Monday, September 11, 2000, was the next work day. On that day, Ms. Williams made a personal call from her work station, which is forbidden by the Verizon work rules. Plaintiff's Admissions at # 99; Williams Dep. at 341–42. Ms. Newkirk observed this call from the "force room" where calls are monitored. Because Ms. Stewart, Ms. Williams's direct supervisor, was "not there at the moment" and Mr. Covington "was in the force room," Ms. Newkirk directed Mr. Covington to tell Ms. Williams to end her personal call.

---

**3.** Ms. Williams argues in her brief about a more pervasive hostile work environment because of alleged actions by Mr. Covington towards other Verizon employees. Opposition to Motion for Summary Judgment at 5–7 [hereinafter Opp.]. Admittedly, she did not know or hear of these alleged actions until she decided to file a charge with Verizon's internal equal employment opportunity office. Williams Dep. at 131–36, 155–160. The Court will disregard these allegations as they clearly had no impact on Ms. Williams's own work experience.

Newkirk Dep. at 103–04. There is some dispute as to the extent of this incident. Ms. Newkirk states that she observed Ms. Williams get right back on the call after Mr. Covington had told her to get off. Newkirk Decl. ¶ 4. Ms. Williams asserts that "[m]y personal call was made *prior to* Percy [Covington] approaching me" but does not address whether she remained on the line afterward or called a second time on personal business. Plaintiff's Admissions at # 100 (emphasis added). Her union representative later argued that Ms. Williams did not make *two* calls because she "never terminated the call when [Mr. Covington] left her desk [but] . . . resumed the call." Motion for Summary Judgment, Ex. 6, Grievance Notes at 1764. In any event, Ms. Williams was suspended for five days for this incident. Mr. Covington informed her of the suspension.

Ms. Williams asserts that she suffered further harassment of a non-sexual nature afterward. On September 19, 2000, Mr. Covington asked her, when she was away from her work station, "Are you on break?" It turned out that Ms. Williams had failed to log out correctly and appeared to be still at work. Williams Dep. at 323–24. On September 20, Mr. Covington told her that she "had been in wrap for thirty five minutes." Interr. Answ. at # 4.[4] On September 19, 2000, Ms. Williams was called by Kelly Adrea, the supervisor of the "force room," to advise that she was "in wrap for seven minutes" and that she should call for assistance if she needed help. *Id.* Ms. Adrea was responsible for "monitor[ing] the length of a call," including wrap. Williams. Dep. at 384. Ms. Stewart is alleged to have engaged in three incidents of harassment. First, she is alleged to have monitored Ms.

Williams's calls at the beginning of the shift on September 21, 2000, right after Ms. Williams talked with Ms. Stewart about Mr. Covington. Interr. Answ. at # 4 ("I informed her that I was tired of Mr. Covington bothering me."). Second, on October 12, 2000, Ms. Stewart allegedly delivered a performance report (called a "report card") to Ms. Williams at her work station without stopping to talk about it, as she allegedly stopped to talk to other employees. Williams Dep. at 190–96. The report card reflected a rating of "Meets Some" performance criteria instead of "Meets All," as Ms. Steward had earlier told Ms. Williams she would be receiving. Interr. Answ. at # 8. Third, on October 21, Ms. Stewart is alleged to have talked with Eva Banks, who thereafter commented audibly to another employee that " '[S]he, meaning [Ms. Williams], is jealous of Tawanda's relationship with Mr. Covington, and that [Ms. Williams] should not play with Mr. Covington's job because he has a family to take care of." ' *Id.* Coordinator Reginald Baker is also alleged to have harassed Ms. Williams when, on September 28, 2000, he "advise[d Ms. Williams] that [she] was in wrap for nine minutes." *Id.* at # 4. Ms. Williams argues that "the behavior towards me from Tawanda [Stewart] is because she is currently in a relationship with Percy [Covington]; from Kelly [Adrea] because they used to be in a relationship." Opp., Ex. 14, Williams EEOC Charging Questionnaire. She does not allege any personal relationship between Mr. Covington and Mr. Baker.

Ms. Williams filed an internal EEO charge on September 28, 2000. Prior to that date, Ms. Williams had not told anyone in a management position at Verizon

---

4. "Wrap" refers to the time it takes after the conclusion of a customer call for an employee to input the necessary information on the customer's problem. In general, the total time of a call, including wrap, should be less than five minutes. Williams Dep. at 369–70.

that Mr. Covington had made inappropriate comments of a sexual nature to her or touched her inappropriately. Plaintiff's Admissions at 109, 110.[5] The EEO charge became known to Ms. Williams's immediate supervisors within days. Ms. Newkirk advised Mr. Covington to have no contact with Ms. Williams. Newkirk Dep. at 70. Mr. Covington told Mses. Stewart and Adrea about the EEO charge on the day that he heard of it. Covington Dep. at 138–39. Mr. Covington and Mses. Stewart and Adrea were social friends outside the office. *Id.* at 119–120.

Ms. Williams advanced to the fourth step of the Attendance Plan on October 18, 2000. Pursuant to the Plan, Ms. Newkirk reviewed her attendance record and concluded that Verizon had "been more than fair for an employee with less tha[n] one [year's] service." Motion for Summary Judgment, Ex. 10. After consulting with Labor Relations, Ms. Newkirk terminated Ms. Williams. Newkirk Decl. ¶¶ 10, 11; Newkirk Dep. at 134–137, 141.

### Legal Standard

Summary judgment is not a "disfavored procedural shortcut" but, rather, can be an appropriate way to resolve litigation without the time and expense of trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment should be entered when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that there is no genuine issue as to any material fact. FED. R. CIV. P. 56. Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material

fact is in dispute, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Washington Post Co. v. U.S. Dep't. of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989). Where the nonmovant bears the burden of proof, the nonmovant may not rely on conclusory allegations, but must present specific facts from which a reasonable jury could conclude in the nonmovant's favor. *See Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999).

██ This case must also be decided under the legal standards of Title VII; 42 U.S.C. § 2000e *et seq.* In 1998 twin decisions, the Supreme Court clarified the law in the area of Title VII jurisprudence dealing with sexual harassment. *See Faragher v. Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In general, *quid pro quo* relates to sexual harassment through threats of retaliation that are actually carried out. *Gary v. Long,* 59 F.3d 1391, 1395 (D.C.Cir.1995) ("The gravamen of a *quid pro quo* claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences flow from the employee's refusal.") (citations omitted). If there is no tangible employment action, "bothersome attentions or sexual remarks that are sufficiently severe or pervasive ... create a hostile work environment." *Burlington Indus.,* 524 U.S. at 751, 118 S.Ct. 2257. In either event, "Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment ... [but] the latter must be severe or perva-

**5.** Ms. Williams told Ms. Stewart on September 20 that Mr. Covington was "bothering her" but only reported alleged sexual harassment on September 28. *See* Interr. Answ. at # 4; Plaintiff's Admissions at 109, 110.

sive." *Id.* at 752. "[I]ncidents of environmental sexual harassment 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Faragher*, 524 U.S. at 787 n. 1, 118 S.Ct. 2275 (citing *Carrero v. N.Y. City Housing Auth.*, 890 F.2d 569, 577 (2d Cir.1989)). "[A] sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* at 776; *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In evaluating a claim of sexual harassment, the Supreme Court has directed the lower courts to "'look[ ] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."' *Faragher*, 524 U.S. at 787–88, 118 S.Ct. 2275 (citing *Harris*, 510 U.S. at 21–23, 114 S.Ct. 367). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 788, 118 S.Ct. 2275.

▇▇▇ An employer may defend against a showing of hostile work environment caused by sexual harassment by demonstrating that there was no hostile work environment or, as an affirmative defense, "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807, 118 S.Ct. 2275. "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as dis-

charge, demotion, or undesirable reassignment." *Id.* at 808, 118 S.Ct. 2275; *see also Burlington Indus.*, 524 U.S. at 762–63, 118 S.Ct. 2257.

**Analysis**

*A. Material Facts in Genuine Dispute*

Ms. Williams asserts that there are material facts as to which there are genuine disputes which prevent summary judgment.

▇▇▇ First, Ms. Williams argues that "Verizon's grounds for termination, if any, were not formulated until sometime after October 18, 2000." *Compare* Plaintiff's Statement of Material Facts as to Which There Are Genuine Disputes # 1 ("Plaintiff's Facts") *with* Opp. at 19 (discharge on October 18, 2000). This argument misapprehends an Employee Contact Memorandum ("ECM") dated October 24, 2000, which purported to notify Ms. Williams of her advancement to Step 3 of the Attendance Plan. The ECM noted chargeable absences on 9/27/00, 10/2/00, 10/3/00, 10/4/00, 10/5/00 and 10/6/00. In lieu of imposing a suspension, it "waived 5 day suspension because additional absences advances [sic] her to the next Step." *See* Opp., Ex. 1. This document shows that Verizon was slow to "write up" Ms. Williams's attendance lapses but it does not suggest that she was not terminated on October 18, 2000, or that the reason given—attendance issues—was false. Since there is no dispute but that Ms. Williams had been fully instructed on the Attendance Plan, that she was absent on the days in question prior to her discharge, and that those absences were "chargeable" under the Plan, the Court finds that the ECM presents no material issue of genuine dispute.

▇▇▇ Second, Ms. Williams also disputes, at length, Verizon's description of

the personal phone call on September 11, 2000. Notably, she does not dispute the fact that she made a personal phone call from her work station on that date or that such a call was in violation of Verizon work rules. At dispute is whether Ms. Williams made one call before Mr. Covington spoke to her and one call thereafter, or remained on the telephone after being told to terminate the call. Since the suspension imposed on Ms. Williams for this incident was not part of the progressive discipline that led to her termination, the Court finds that this dispute is not "material" to the disposition of the case.

Ms. Williams appears to argue that Mr. Covington's misconduct—"touching" her on June 26 and September 8, 2000—had some bearing on the telephone incident. *See* Plaintiff's Facts at 2. The argument does not explain what the connection might be. In addition, it is not supported by the record. The only "touching" incident occurred on June 26, when Mr. Covington "poked" Ms. Williams in the side. Not only is the alleged "poking" considerably out of time to the personal telephone call, it does not necessarily carry any sexual overtones. In addition, Ms. Williams argues that Verizon "has not stated that this [telephone] incident warranted terminating" her. Plaintiff's Facts at 2. Verizon has never made such an argument. Neither of these arguments identifies a material fact in genuine dispute.

■ Third, and of potentially greater import, are Ms. Williams's arguments that Mr. Covington "participated" in the decisions of Ms. Newkirk to suspend Ms. Williams on September 11, 2000, and to terminate her for unsatisfactory attendance in October 2000. Since Ms. Williams is defending against a motion for summary judgment, the Court will construe the facts, to the extent they are in dispute, in

her favor. *See Celotex*, 477 U.S. at 322–323, 106 S.Ct. 2548.

■ Despite the argument in brief, the Court finds no evidentiary support for Ms. Williams's bald assertions that Mr. Covington "participated" in Ms. Newkirk's decision to terminate Ms. Williams for poor attendance. Ms. Williams cannot rely on mere conclusory statements but needs to present specific facts from which a reasonable jury could conclude in her favor on this point. *See Greene*, 164 F.3d at 675. This she has failed to do. The Court concludes that there is no material issue in genuine dispute as to Mr. Covington's alleged role in the termination decision.

Ms. Williams addresses only the suspension decision and Mr. Covington's alleged role in it. The argument that Mr. Covington "participated" in Ms. Newkirk's decision to suspend Ms. Williams or that the degree of his participation is "in grave dispute" is based on a mischaracterization of this evidence. Plaintiff's Facts at 2. Ms Williams cites testimony by manager Toni Newkirk that "I didn't directly do the discipline" and that it was the responsibility of the "team leader." Newkirk Dep. at 58–59. This argument truncates Ms. Newkirk's testimony and overlooks important components to it. As the manager of the Service Center, Ms. Newkirk had the authority to discipline the Maintenance Administrators directly. *See* Newkirk Dep. at 59. However, she explained,

> If something would happen that was, for example, against company policy, it would be my decision as to whether there was discipline and what the discipline was. But I didn't directly do the discipline.

*Id.*

In this context, it is clear that Ms. Newkirk alone decided whether and to what extent discipline might be administered but she directed the team leaders to notify

affected employees of her decisions. Her description of the discipline administered to Ms. Williams for the infamous personal telephone call followed this exact pattern: Ms. Newkirk personally observed the infraction from the "force room" and directed Mr. Covington to tell Ms. Williams to terminate her personal call;[6] Ms. Newkirk observed Ms. Williams continue (or reconnect) the call after Mr. Covington's admonition to her; and Ms. Newkirk decided to suspend Ms. Williams for five days. *See* Newkirk Dep. at 101–03. The record reveals no basis to question Ms. Newkirk's assertion that she alone made these decisions. *See* Newkirk Aff. ¶ 5 (no input from Covington); Covington Dep. at 130–32, 158 (Covington had no authority to suspend and never recommended that Williams be suspended). There is likewise no argument that Ms. Newkirk was biased against Ms. Williams, as Ms. Williams argues infected the actions of Mses. Stewart and Adrea because of alleged personal relationships with Mr. Covington.

Ms. Williams's bald assertions that Mr. Covington "participated" in the decision to suspend her has no substantive evidentiary support beyond his role as messenger. The fact that Mr. Covington was the message-bearer as to the suspension, does not, upon review of the record and despite Ms. Williams's speculations otherwise, change the fact that Ms. Newkirk alone made that decision. However, even if Mr. Covington spoke with Ms. Newkirk about suspending

Ms. Williams on September 11, the Court would not find that the suspension was improper because Ms. Williams has admitted to a violation of work rules by making a personal phone call, regardless of whether she continued the same phone call or made another phone call after Mr. Covington approached her.

Therefore, the Court finds that there is no material issue in genuine dispute as to Mr. Covington's role in the suspension decision. Even if this matter were in some dispute, however, the Court finds that it does not need to resolve that dispute to address the merits of the summary judgment motion because the work-rule violation is admitted by Ms. Williams.

██ Finally, Ms. Williams argues that there are material issues between the parties concerning the "subjective recordation of absences" because Ms. Adrea "is a close friend of Mr. Covington who goes out with him for dinner and drinks." Plaintiff's Facts at 3. Similarly, Ms. Williams argues that all of the absences after Ms. Williams reached Step 2 of the Attendance Plan occurred after September 8, 2000, when Ms. Williams was allegedly harassed by Mr. Covington. *Id.* at 4. These arguments fail to raise a genuine dispute because Ms. Williams has admitted to the relevant absences, incidents of tardiness and the chargeability of the same under the Attendance Plan.[7] *See* Plaintiff's Admissions at 63, 64, 72, 73, 75, 76, 78, 79, 81, 82, 84, 85, 87, 88, 90, 91.[8] The timing of these

---

6. Each Maintenance Administrator had two telephone lines at the work station. One was for incoming calls from customers. Use of the other line could be seen by a light in the "force room" and informed management when a Maintenance Administrator was on the telephone but likely was not talking directly with a customer. *See* Newkirk Dep. at 101–02. Ms. Newkirk monitored Ms. Williams's September 11, 2000, call, which was placed on this second line, and recog-

nized it as a non-business call. *See id.* at 102–03.

7. Whether Mr. Covington "participated in several inappropriate conversations of a sexual nature with associates ...," as alleged by Ms. Williams, Plaintiff's Facts at 4, is irrelevant to her case since she had no knowledge of such conversations with others.

8. Ms. Williams also admitted to another absence on October 2, 2000, but denied that she

absences appears to have been caused by her daughter's illness, *see id.* at 71, 74, 77, 80, 83, 86, 89, unconnected to any actions by Mr. Covington, Ms. Adrea, or Ms. Newkirk.[9]

### B. *Alleged Quid Pro Quo Sexual Harassment*

Having concluded that there are no material issues in genuine dispute, the Court turns to the merits of the case.

Ms. Williams argues that she is a member of a protected class, experienced unwelcome sexual advances based on her sex, and that her refusal to submit to these advances resulted in her suspension and later termination. Opp. at 13–14. She asserts that it is clear that Mr. Covington used her rejection of his sexual advances as the basis for suspending her on September 11, 2000. *Id.* at 13. She also asserts that his request that she accompany him to a hotel room meets the requirements of *quid pro quo* sexual harassment. *Id.* at 14. Ms. Williams argues that the reason Verizon offers for her termination, unsatisfactory attendance, is pretextual and that she was terminated for refusing Mr. Covington's advances. *Id.* at 13.

The concepts of *quid pro quo* and hostile work environment represent a handy, although not always precise, way to distinguish between discrimination claims. *See Burlington Indus.,* 524 U.S. at 752, 118 S.Ct. 2257. Ms. Williams's *quid pro quo* claim can survive only if she can demonstrate supervisory threats that were then carried out because she refused to accede to sexual demands. *Id.* at 751, 118 S.Ct. 2257 ("The terms *quid pro quo* and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility."). Her claim fails for lack of proof of any threats at all. Assuming that Mr. Covington made all the comments and asked all the questions attributed to him by Ms. Williams, nothing in the record suggests any "threat" of adverse action if she failed to accede.

To counter this conclusion, Ms. Williams argues that Mr. Covington asked her to go with him to a hotel room and that this request constituted *quid pro quo* harassment. *See* Opp. at 14. The argument is not persuasive. Mr. Covington asked if Ms. Williams could get him a hotel room and when she said that she could and when

---

was told this constituted a "chargeable absence." Plaintiff's Admissions at 69, 70. This does not create a dispute of material fact because the number of admitted chargeable absences was subject to discipline under the Regional Attendance Plan. Even discounting October 2, 2000, Ms. Williams was absent more than four consecutive days, which advanced her a step under the Plan. *See* Motion for Summary Judgment, Ex. 10.

9. *Ms. Williams points to the testimony of Yasmin Atkins to support her argument that the administration of discipline for violation of the Attendance Policy was discretionary.* Atkins Dep. at 96–97 ("[T]he absence administrator could determine what kind of discipline to take against you [and] ... may or may not hold that against you."). Ms. Atkins identi-

fied a woman named Keisha (last name unknown) who allegedly was not disciplined for an absence, and a man named Terrell Graves (who resigned) who was not disciplined, and "many other employees that I don't know off the top of my head who should have been disciplined" but were not. Atkins Dep. at 130. The problem with this testimony is that it ignores that Ms. Williams has admitted to all absences but two and has admitted that all but one of these absences were "chargeable." Ms. Atkins' vague testimony does not raise a material issue of genuine dispute as to whether Ms. Newkirk, who is not shown to have any bias against Ms. Williams, had a legitimate basis to discipline Ms. Williams for the admitted 20–22 absences and 10 tardies in nine months of employment.

did he want it, he responded "whenever you're available." Williams Dep. at 332. This conversation, as related by Ms. Williams, contains no threat or hint of reprisal if Ms. Williams refused to accompany Mr. Covington to a hotel room. No other alleged statement by Mr. Covington contained any threat or hint or reprisal.

Recognizing that she has no threatening statement from Mr. Covington, Ms. Williams ties his alleged harassment and her discharge by asserting that her "refusal to submit to Covington's demands and complaint to the EEO resulted in her termination" and that "Mr. Covington used Ms. Williams['s] rejection of his sexual advances as the basis for suspending her." Opp. at 13. In order to prevail, Ms. Williams must show that there is a causal connection between her refusal and either of these adverse employment actions. *See Burlington Indus.*, 524 U.S. at 753–54, 118 S.Ct. 2257 (plaintiff must show "that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands."); *Gary v. Long*, 59 F.3d 1391, 1395 (D.C.Cir.1995) (to prove quid pro harassment, adverse consequences must follow as a result of employee's refusal to submit to sexual advances) (citations omitted). Upon such a showing, the burden shifts to Verizon to articulate a legitimate, non-discriminatory reason for the challenged adverse action. *See Texas Dep't Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Holbrook v. Reno*, 196 F.3d 255, 263 (D.C.Cir.1999). If Verizon states a legitimate non-discriminatory reason for the discipline, Ms. Williams then must prove that the stated reason is pretextual. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817.

Construing all the facts in the light most favorable to Ms. Williams, she has demonstrated that she is a member of a protected class, *i.e.*, female; that she was subject to unwelcome sexual advances, *i.e.*, Mr. Covington's actions and comments; and that she suffered adverse employment actions, *i.e.*, suspension and termination. Beyond argument, she has not shown any causal connection between her refusal to submit to Mr. Covington's advances and the adverse employment actions, nor has she shown that Verizon's non-discriminatory reasons for her suspension and termination are pretextual.

### 1. *Termination*

Addressing the termination first, the Court finds that Ms. Williams earned her discharge in the good old-fashioned way: faced with a job she found uninteresting, she failed to show up for work 20–22 times (essentially, one month of work days) and was tardy an additional 10 times (almost one-half of a work month) in her first nine months of employment.

Mr. Covington had nothing to do with Ms. Williams's absences or the computer system that automatically recorded them. As stated above, there is no evidence linking him to the termination decision. However, Ms. Williams argues that Ms. Adrea refused to excuse absences after September 28, 2000, due to Ms. Adrea's "personal friendship" with Mr. Covington. Plaintiff's Facts at 3. Giving Ms. Williams all the presumptions and inferences in her favor, and therefore assuming that Ms. Adrea had a personal bias against Ms. Williams due to friendship with Mr. Covington, the Court finds that the record does not support a claim that Ms. Adrea failed to excuse Ms. Williams's absences because Ms. Williams had rejected Mr. Covington.

According to her own Admissions, Ms. Williams was scheduled for work and did

not work on October 3, 4, 5, 6, 9, 11, and 17, mostly caused by her daughter's illness. Plaintiff's Admissions at 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84,85, 86, 87, 88, 89, 90, 91, 92, 93. Each of these absences constituted a "chargeable" absence. *Id.* As of September 28, 2000, when Ms. Williams filed her internal EEO charge with Verizon, her attendance record was so bad that it would take only a single additional unexcused absence for Ms. Williams to be moved from Step 3 to Step 4 of the Attendance Plan and to be considered for discharge. *See* Motion for Summary Judgment, Ex. 8, Regional Associate Attendance Guidance; Plaintiff's Admissions at # 93. She missed seven days between September 28 and October 18, 2000. Thus, not only was her attendance record not improving but the frequency of absences was accelerating. The record contains no evidence of other employees with similar attendance records, accelerating failures to come to work, and short tenure.[10] Nor is there any record evidence that Ms. Williams asked Ms. Adrea for a waiver of the Attendance Plan in October 2000 or that Ms. Adrea had earlier excused such absences and refused to excuse these absences only after Ms. Williams's refusal of Mr. Covington's overtures. Upon this record, Ms. Williams has failed to show any causal connection between her refusals of Mr. Covington's alleged advances and her termination.

Ms. Williams failed to meet the attendance and punctuality requirements of her job. She admits the absences and tardies and does not connect the decision-maker, Ms. Newkirk, to any bias against her. Given these admissions, the reason for her termination was not "false" or a pretext for discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Ms. Williams has failed to counter Verizon's legitimate, nondiscriminatory, reason for her termination.

### 2. *The Suspension*

 The claim that Mr. Covington suspended Ms. Williams or played a role in the decision to suspend her arises from the timing of the suspension—the next work day after Ms. Williams rejected his overtures—and his role as the messenger from Ms. Newkirk. Construing all the facts in the light most favorable to Ms. Williams with respect to her suspension claim, she has shown that she is a member of a protected class, she was subject to unwelcome overtures because of her sex, she suffered a tangible job detriment when she was suspended, and Verizon is liable if its supervisors engaged in actionable misconduct. The question is whether Ms. Williams was suspended because she declined Mr. Covington's demands.

 Assuming for these purposes that Mr. Covington sexually harassed Ms. Williams on or prior to September 8, 2000, the Court finds that he did not participate in Ms. Newkirk's decision to suspend Ms. Williams for her unauthorized telephone call and insubordination in refusing to end the call or in making a new call. Ms. Newkirk observed Ms. Williams on a personal call and monitored it, observed that the call continued (whether resumed or reconnected) after Ms. Williams was told to hang up, decided immediately that Ms.

---

**10.** Ms. Williams cites the attendance record of William Jackson, who was also at Step 4 of the Attendance Plan and not terminated. Mr. Jackson's attendance problem was tardy arrivals, not full absences, except for one period of time when he was hospitalized. His absences during that period were "chargeable" only because he had exhausted his sick leave. *See* Reply at 10; Reply Exs. 7, 8. This attendance record is distinctly different from that presented by Ms. Williams.

Williams's insubordination warranted disciplinary action, and determined the appropriate sanction. Newkirk Decl. ¶¶ 3–5. When Ms. Newkirk decided to suspend Ms. Williams, she had no knowledge of alleged misconduct by Mr. Covington because Ms. Williams did not make her charges until September 28 through the internal EEO process. *Id.* at ¶ 7. Ms. Williams admits that she made a personal telephone call which violated office policy. *See* Plaintiff's Admissions at 98, 99; Williams Dep. at 341–45 (expressing lack of recall but not denying insubordination). Where there is no evidence to support a connection between the individual who decides on discipline and the individual who engaged in alleged harassment, there is no actionable claim to redress the discipline. *See Holbrook,* 196 F.3d at 260–61 (decision-maker not the alleged harasser). Accordingly, Ms. Williams's *quid pro quo* claim fails for lack of causation.

Moreover, even if Mr. Covington participated in the decision to suspend Ms. Williams, that decision was based on a legitimate, non-discriminatory reason— Ms. Williams's unauthorized telephone call and insubordination in refusing and failing to terminate it when directed to do so or in reconnecting it after the fact, *See Holbrook,* 196 F.3d at 263–64. Ms. Williams's claim that the reason for her suspension is a pretext fails in the face of her admissions that she engaged in the very conduct for which she was disciplined. *See Fischbach v. D.C. Dep't of Corr.,* 86 F.3d 1180, 1183 (D.C.Cir.1996) (reason for discipline must be "phony") (citing *Pignato v. Am. Trans Air, Inc.,* 14 F.3d 342, 349 (7th Cir.1994)).

### C. *Retaliation.*

 Ms. Williams alleges that her suspension and later discharge were in retaliation for her rejection of Mr. Covington's advances and her formal EEO complaint. She also alleges retaliatory mistreatment by Mr. Covington and other Verizon employees. To establish a prima facie case of retaliation, Ms. Williams must show that "(1) she engaged in statutorily protected activity; (2) her employer took an adverse personnel action against her; and (3) a causal connection between the two exists." *Holbrook,* 196 F.3d at 263 (citations omitted).

 Ms. Williams argues that from the moment she rejected Mr. Covington on September 8, 2000, "retaliation began. He suspended [Ms. Williams], he pestered her about whether she was on a break, he annoyed her regarding the use of the telephone, he told her, 'you have serious issues,' and when she expressed her frustration on one occasion, he yelled, 'you are going to hear what I have to say right now.'" Opp. at 7–8; *see also* Interr. Answ. at # 4.

Construing all the facts in the light most favorable to Ms. Williams, her retaliation allegations with respect to Mr. Covington fail because they ignore pertinent record facts. Ms. Williams has shown that she engaged in a protected activity, *i.e.,* rejecting Mr. Covington's advances and filing a formal EEO complaint; and that she suffered an adverse personnel action, *i.e.,* her suspension and termination. However, as discussed above, she has not shown any causal connection between her protected activities and the adverse actions. Mr. Covington did not suspend Ms. Williams; rather, Ms. Newkirk suspended her. Ms. Newkirk had no knowledge of Ms. Williams's rejection of Mr. Covington's advances at the time she made the suspension decision. Even assuming that Mr. Covington had some input in the suspension decision, Ms. Williams has failed to rebut the non-retaliatory reason for her suspension, *i.e.,* her admitted violation of

work rules and insubordination. *See id.* (once employer advances a legitimate, non-discriminatory reason for an adverse personnel action, employee must prove, by a preponderance of the evidence, that the reason is pretextual).

Likewise with her termination, as discussed above, Ms. Williams has not shown any causal connection between her rejection of Mr. Covington's advances and her filing of an EEO charge and her termination. Mr. Covington had no control over the computer system which recorded the absences and tardies that led to her termination. Even assuming Ms. Adrea, the individual with authority to excuse absences, had a bias against Ms. Williams based on Ms. Adrea's friendship with Mr. Covington, Ms. Williams's claim of retaliation still fails. Ms. Williams offers no evidence that she requested and was refused any waivers of the Attendance Plan. Similarly, she has not shown that Ms. Adrea refused to excuse absences that she earlier would have granted after Ms. Williams's rejection of Mr. Covington or her filing of her EEO complaint. Ms. Williams admitted the absences and tardies that led to her termination. She has not shown that the final decision-maker, Ms. Newkirk, was biased against her, nor has she shown that the proffered reason for her termination, failure to meet attendance requirements, was a pretext for discrimination.

With respect to the other allegations of retaliatory conduct on the part of Mr. Covington, he asked Ms. Williams about her time on break because she had inadvertently failed to log out properly, and he directed her to hang up on her personal call in conformance with office work rules. Ms. Williams either admits these facts or fails to counter Verizon's evidence concerning them with facts rather than argument. There is no need to determine whether Ms. Covington yelled at Ms. Williams, as alleged, because that single incident would not constitute retaliation.

In addition, allegedly because of friendship with Mr. Covington, Ms. Stewart stopped speaking to Ms. Williams and failed to discuss her report card with her, she gave a Meets Some rating instead of a Meets All rating, and she talked about Ms. Williams to Ms. Banks. *See* Opp. at 8. Other supervisors allegedly monitored her calls and Ms. Adrea failed to excuse her absences because of friendship with Mr. Covington.

None of the other incidents rises to the level of actionable retaliation even if prompted to some degree by friendship with Mr. Covington and animus towards Ms. Williams for making his life difficult. *See Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999). None of these incidents led to any tangible job detriment that could be remedied. *See id.* As discussed above, there is no record evidence that Ms. Williams asked Ms. Adrea for a waiver of the Attendance Plan in October 2000 or that Ms. Adrea had earlier excused such absences and refused to excuse these absences only after Ms. Williams's refusal of Mr. Covington's overtures. The reduced rating on Ms. Williams's report card was not a retaliatory adverse employment action because it did not affect her salary or job classification, and because she lost her position because of violations of the Attendance Plan and not based on her performance. *See Brown,* 199 F.3d at 458 (poor performance evaluation not an adverse employment action where it did not affect employee's salary or grade).

### D. *Hostile Work Environment*

 To establish a *prima facie* hostile work environment claim, Ms. Williams must offer proof that "(1) [she] was a member of a protected class; (2)[she] was

subjected to unwelcome[ ] sexual harass-ment ...; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment ...; and (5) the existence of respondeat superior liability." *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122–23 (D.C.Cir.2002) (citation omitted). Ms. Williams alleges that Mr. Covington sexually harassed her and that Messrs. Covington and Baker and Mses. Adrea and Stewart contributed to the hostile work environment by harassing her in connection with her job performance.

It is clear that Ms. Williams is a member of a protected class, that she was subject to unwelcome sexual overtures that were based upon her sex and that Verizon might have liability. What is not clear is whether "the charged sexual harassment had the effect of unreasonably interfering" with her work performance or creating an hostile work environment.

 A workplace is not "hostile" under Title VII unless offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C.Cir.1999) (quoting *Oncale v. Sundowner Offshore Svcs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)); *see also Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 ("[C]onduct must be extreme to amount to a change in the terms and conditions of employment.").

 The alleged conduct by Mr. Covington, which the Court assumes occurred for purposes of summary judgment, was deplorable but not so severe or persistent as to constitute a change in terms and conditions of employment. The Court discounts the event of "poking" on June 26, 2000, which even Ms. Williams did not take seriously. *See* Williams Dep. at 307; *see also Faragher*, 524 U.S. at 788, 118 S.Ct. 2275 (unless extremely serious, teasing or isolated incidents do not constitute a change in terms and conditions of employment). The events of September 8 were distinctly more serious. Mr. Covington repeatedly told Ms. Williams "you know you want me" and tried to get her agreement to meet him in a hotel room. Had there been further actions of this nature after September 8, there might have been a consistent course of conduct sufficient to demonstrate a change in terms and conditions of employment. Harassment "must be more than episodic;" to be pervasive, it must be "sufficiently continuous." *Faragher v. Boca Raton*, 524 U.S. at 776 n. 1, 118 S.Ct. 2275 (citations omitted). But there are no allegations of misconduct by Mr. Covington after September 8 that would amount to sexual harassment or contribute to a hostile work environment.

The Court agrees with Ms. Williams's theory that friends of an harasser might contribute to a hostile work environment but concludes that she has failed in her proofs in this regard. The very few actions by Mses. Stewart and Adrea and Mr. Baker are all work-related and directly within the scope of duties of each manager, which Ms. Williams does not contest. In addition, there is no evidence of any kind tying Mr. Baker to Mr. Covington's actions by friendship or otherwise. As found above, even if Ms. Adrea failed to excuse some absences that she might otherwise have excused, there is no evidence that Ms. Williams sought such a waiver of the Attendance Plan in September or October 2000.

The behaviors from Mr. Covington, as related by Ms. Williams, were infrequent,

not severe, and not physically threatening or humiliating. The behaviors by others of which she complains were directly work related. Even taken together, they could not have *unreasonably* interfered with Ms. Williams's work performance. *See Stoeckel v. Envtl. Mgmt. Sys., Inc.*, 882 F.Supp. 1106, 1114 (D.D.C.1995) (unprofessional and inappropriate behavior did constitute a hostile work environment where incidents were not physically threatening, employee did not report conduct for four months, and behavior ceased when employee reported it). Mr. Covington's conduct might have been boorish but, according to record evidence, he stopped when told clearly that his attentions were not wanted.

Given this conclusion, the Court need not address whether Verizon had a bona fide sexual harassment plan in place or whether Ms. Williams acted promptly in bringing her complaints to management's attention. It is noted that the internal EEO charge was filed on September 28, after a three-week period in which Mr. Covington apparently engaged in no more objectionable behavior and just as Ms. Williams's attendance record moved her towards the 4th Step and put her in imminent risk of discharge. Nonetheless, Ms. Williams proceeded to absent herself from the job in October.

### Conclusion

For the reasons stated above, Verizon's motion for summary judgment is **GRANTED**. A separate Order will Accompany this Memorandum Opinion.